## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| NOE T. CANTU, | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | C.A. NO. C-04-658 |
| | § | |
| UNIVERSITY OF TEXAS, AUSTIN, | § | |
|     Defendant. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pending before this Court is defendant's Motion for Summary Judgment (D.E. 18). The Court held a hearing on defendant's motion. For the reasons discussed herein, the Court grants defendant's Motion for Summary Judgment and hereby dismisses all claims against the defendant with prejudice.

Summary judgment is appropriate only where there is no genuine issue of material fact. Fed. R. Civ. P. 56. The Court may consider all pleadings, depositions, affidavits, and other evidence before it, and "[t]he evidence must be viewed in a light most favorable to the nonmovant." *Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003). Under Rule 56(e), "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e). Instead, the adverse party "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Id*. After the adverse party has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the adverse party, the Court will grant summary judgment. *Caboni v. General Motors Corp.*,

278 F.3d 448, 451 (5th Cir. 2002).

## I. FACTS

In resolving this motion, the Court views the facts in the light most favorable to the plaintiff.  Plaintiff Cantu was employed by the University of Texas, Austin, as the Captain of the research vessel Longhorn.  The Longhorn is a 100 foot long ship weighing approximately 150 tons, and it is owned and operated by the University of Texas.

This lawsuit concerns the discharge of plaintiff Cantu after the Longhorn collided with a standpipe while plaintiff was on watch at the helm of the ship.[1]  The standpipe stands approximately 30 feet out of the water (D.E. 18, exh. B), and there is a solar powered warning light on top of the standpipe's scaffolding (November 13, 2003 step-two appeal letter, D.E. 18, exh. B-9, p. 6).  The accident occurred on August 8, 2003, off the coast of Louisiana in the Gulf of Mexico.  On the day of the accident, the Longhorn was dragging the sea bottom for biological samples.  The Longhorn was carrying at least 11 passengers who were members of a scientific research party.  The area in the Gulf of Mexico where the Longhorn was operating had several large oil rigs (exh. 4 to plaintiff's deposition, D.E. 19, exh. B).

On the day of the accident, plaintiff came on watch around 12:30 p.m. (plaintiff's deposition, D.E. 19, exh. B, p. 189).  Plaintiff was alone on the bridge and the Longhorn was on autopilot (*id*., p. 198).  Plaintiff looked out the windows and saw the Longhorn

---

[1]  It is not clear from the summary judgment evidence whether the standpipe was active, or whether the standpipe was used to produce oil or natural gas.

approaching the standpipe (*id*., p. 189). Plaintiff testified that he clearly saw the standpipe and that it was at the eleven o'clock position off the ship's port side (*id*., p. 190). Plaintiff admitted that the sea was calm, it was broad daylight, and there was clear visibility (*id*., p. 195). Plaintiff then turned his back and faced away from the windows to use the bridge computer to try and send an email (*id*., p. 190). Plaintiff testified that he could have sent the email at any time, but that he felt it was an appropriate time use the bridge computer (*id*., p. 194). The bridge computer is about eight feet from the windows, and plaintiff admitted that he could have asked either of the two Mates on the Longhorn to take over the watch while he attempted to send the email (*id*., 194-95). Plaintiff testified that he did not know how long he used the computer with his back to the windows (*id*., p. 196), and that he could not remember how far away the standpipe was when he decided it was an appropriate time to send the email (*id.*, p. 189).

When plaintiff eventually turned his attention from the computer and looked out the windows, plaintiff realized that the Longhorn was on a collision course with the standpipe (*id*., p. 200). Plaintiff testified that the Longhorn was approximately 500 feet from impact and traveling at a speed of 9 knots (*id*. p. 188, 200). Plaintiff switched to manual steering but got no response (*id*., p. 200). Plaintiff then attempted to use the Longhorn's engines to change course, by first reversing the starboard engine and leaving the port engine on forward, and then switching both engines to reverse (*id*., p. 201). Plaintiff was unable to change the Longhorn's course, and the ship struck the standpipe at approximately 1:30 p.m., causing damage to both the standpipe and the ship. None of the

passengers aboard the Longhorn were seriously injured.  Plaintiff states that the Longhorn sustained approximately $1500 worth of damages (D.E. 19, exh. A, p. 2).

Plaintiff testified that he believed that the cause of the accident was the failure of the Longhorn's steering motor (*id.*, p. 189).  The Longhorn's steering motor was switched off and because the ship was on autopilot, the autopilot could not control the ship (*id.*, p. 189-99).  This caused the Longhorn to change course while plaintiff was using the bridge computer to send email (plaintiff's deposition, D.E. 19, exh. B, p. 198).  Plaintiff did not know that the Longhorn's steering motors were inoperable until he looked up from the computer, realized the ship was off course, and switched to manual steering (*id.*, 200).  However, the Plaintiff could have determined that the Longhorn's steering motor was switched off prior to the accident, because the bridge console was equipped with an indicator light that lit up when the Longhorn's steering motor was operational (*id.*, p. 121).  After the accident, it was determined that the light bulb had been removed from the indicator light socket on the bridge console (*id.*).

Plaintiff did not notice that the steering motor indicator light was dark when he took over the watch at 12:30 p.m., and he did not realize that the light bulb was missing from the indicator light socket until after the accident (*id.*, p. 121, 125).  Plaintiff admitted that when crew members were on watch, tape or paper was sometimes placed over the indicator light lens because the light from the indicator was bothersome (*id.*, p. 122).  Plaintiff also admitted that there were spare light bulbs for the indicator light on board the Longhorn (*id.*, p. 123).  Plaintiff testified that he did not know what had caused the

steering motor to shut off, but admitted that he could have shut the motor off accidentally (*id.*, p. 187).

The University of Texas conducted an investigation of the accident.[2]  The University found that the indicator light for the Longhorn's steering motor had been inoperative for an extended period of time (August 13, 2003 letter to plaintiff, D.E. 18, exh. B-6).  The University also found that because plaintiff was sending email with his back turned away from the bow of the ship, he was unaware that the Longhorn had veered off course, and that this constituted negligence and a violation of safety practices.  The University asked members of the Longhorn's scientific research party to submit their own account of the accident (D.E. 18, exh. B-2).  Many of the accounts submitted to the University indicate that the plaintiff never apologized for the accident, and that members of the scientific research party did not feel safe continuing the voyage with the plaintiff (*see, e.g.*, Alexander Payson's August 9,2003 accident report, D.E. 18, exh. B-2).

The University terminated plaintiff on August 15, 2003, for "neglect of duties, violation of safety rules or accepted safety practices, and creating a condition hazardous to another person" (August 15, 2003 termination letter to plaintiff, D.E. 18, exh. B-8).  Plaintiff appealed his termination, alleging that there were instances where Anglo, non-Hispanic University of Texas employees also violated procedures but were treated less severely.  On September 10, 2003, the University of Texas denied plaintiff's appeal

---

[2]  The accident was reported to the United States Coast Guard.  The Coast Guard conducted its own investigation of plaintiff's actions on board the Longhorn and found that there was "actionable misconduct" on plaintiff's part.  (April 21, 2004 letter to plaintiff from the United States Coast Guard, D.E. 18, exh. E).

(September 10, 2003 letter to plaintiff, D.E. 18, exh. B-9).  The University reasoned that

if the 150 ton Longhorn had struck the gas line of an active high-pressure natural gas

standpipe the accident could have been disastrous (November 13, 2003 step-two appeal

letter, D.E. 18, exh. B-9).  The University also found that the weight of the evidence

suggested that the Longhorn struck the standpipe at full speed without altering course,

and that the plaintiff never took any evasive measures  (*id.*).

On December 17, 2004, plaintiff instituted this Title VII action against the

University of Texas for violations of 42 U.S.C. § 2000e-2(a).  Plaintiff alleges that the

University intentionally discriminated against him because of his Hispanic ethnicity and

that the University terminated him from his position as Captain of the Longhorn in

retaliation for his opposition to racial discrimination at the University.

## II.  DISCUSSION

### A.  Title VII

Under Title VII, the plaintiff bears the initial burden of proof.[3]  In order to survive

summary judgment, he must raise a genuine issue of material fact that defendants

discriminated against him.  FED. R. CIV. P. 56(c); *Okoye v. Univ. of Tex. Houston Health

Sci. Ctr., et al.*, 245 F.3d 507, 512 (5th Cir. 2001).  To do so, plaintiff must establish a

prima facie case by showing that he "(1) is a member of a protected class; (2) was

---

[3] Plaintiff argues that this is a mixed-motive case.  However, mixed-motive treatment is not appropriate in this case because plaintiff has not come forward with any direct evidence that discrimination was among the motives that prompted the University's adverse action.  *See Fabela v. Socorro Independent School Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).  Therefore, because plaintiff's Title VII claims are supported solely by circumstantial evidence, plaintiff must proceed under the *McDonnell Douglas* burden shifting framework.

qualified for h[is] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." *Id.* at 512-13; *McDonnell Douglas Corp. v. Green*, 93 S.Ct. 1817, 1824 (1973).  The burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the employment decision.  *Id.* at 513.  Once the defendant offers evidence of a nondiscriminatory motive, the burden shifts back to the plaintiff to show that the employment decision was discriminatory.  *Id.* at 512.

**1.  Plaintiff's Discrimination Claim**

Plaintiff has made out a prima facie case of discrimination.  It is undisputed that plaintiff is Hispanic, that prior to the Longhorn's collision with the standpipe the University considered him qualified to be a senior captain, and that he was terminated from that position on August 15, 2003.  As to the fourth element plaintiff needs to establish a prima facie case, plaintiff has submitted the deposition of John Cain (D.E. 19, exh. D), whom plaintiff alleges is an Anglo, non-Hispanic person, and his replacement as Captain of the Longhorn.  Thus, all four elements needed to establish a prima facie case of discrimination have been met.

Defendant University of Texas contends that the plaintiff was terminated for a legitimate, non-discriminatory reason.  Specifically, defendant contends that plaintiff Cantu's employment was terminated because he was derelict in his duties as Captain of the Longhorn, and that his dereliction resulted in the August 8, 2003 collision with the

Page 7 of 14

standpipe.  Defendant points out that the decision to terminate the plaintiff was not made until after a thorough investigation of the accident, and that the investigation determined that plaintiff Cantu was negligent and had violated the Rules of Navigation.  The investigation also determined that plaintiff was involved in email for at least ten minutes prior to the Longhorn's collision with the standpipe, and that plaintiff was not aware that the ship was on a collision course with the standpipe until immediately prior to impact. Defendant also submits that plaintiff's conduct violated the University's Handbook of Operating Procedures, which requires that all employees maintain standards of conduct suitable and acceptable to the University's work environment.  Thus, defendant University of Texas has sufficiently rebutted plaintiff's prima facie case of discrimination and "the presumption of discrimination derived from the plaintiff's prima facie case simply drops out of the picture and the ultimate question [is] discrimination vel non." *Keelan*, 407 F.3d at 345 (citing *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir.1995)).

        In support of his discrimination claim, plaintiff submits that the Longhorn's collision with the standpipe was only minor, that it resulted in no serious injuries, and that there was minimal damage to the ship.  Plaintiff contends that there were other Anglo, non-Hispanic ship captains employed by the defendant who have had on board ship incidents that have placed passengers lives in danger and caused physical damage to their ships.  Specifically, the plaintiff points to two incidents in his affidavit (D.E. 19, exh. A). The first involves Captain Turany, an Anlgo, non-Hispanic who was captain of the

research vessel Katy.  The plaintiff alleges that a fire occurred on board the Katy and that Captain Turany failed to sound the alarm or ensure that the passengers donned their life preservers.  According to the plaintiff, Captain Turany was neither suspended nor terminated for this incident.  The second incident involves Captain Chuck West, who was captain of the research vessel Guy Bragg.  According to the plaintiff's affidavit, one of the ship's engines developed a mechanical failure.  Despite the mechanical failure, Captain West continued the cruise leading to complete and irrevocable damage to the engine system.  The Guy Bragg required $20,000 to $30,000 dollars worth of repairs.

The University of Texas argues that the two incidents cited by the plaintiff are qualitatively different than the Longhorn's collision with the standpipe.  The University addressed the incident with Captain Turany in the University's letter denying plaintiff's appeal, stating that Captain Turany's fire was not due to his negligence, and that Captain Turany was praised for his actions in containing the fire and calming the passengers (D.E. 18, exh. B-9).  The University argues that the incident with Captain West is also dissimilar from plaintiff's circumstances because Captain West did not fail to maintain a proper lookout while at the helm of his ship.

To prove discrimination in this manner, plaintiff must show "that the misconduct for which [the plaintiff] was discharged was nearly identical to that engaged in by ... [other] employee[s]."  *Okoye*, 245 F.3d at 514 (5th Cir. 2001) (citing *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir.1991).  Plaintiff's ship collided with a standpipe in the middle of the Gulf of Mexico in broad daylight and with calm seas.

Plaintiff's circumstances and conduct were not "nearly identical" to that of either Captain Turany or Captain West because neither Captain West nor Captain Turany were involved in a collision with a large stationary object while on lookout at the helm of their ship.

In further support of his discrimination claim, plaintiff makes a general claim in his affidavit that he was subjected to disparaging remarks about his ethnicity while employed at the University of Texas (D.E. 19, exh. A).  However, plaintiff admitted in his deposition that prior to his promotion to captain in 1995, any disparaging racial remarks from coworkers were "not major incidents" but "just comments" that the plaintiff chose to do nothing about (D.E. 19, exh. B, p. 54).  In addition, the comments and incidents that occurred between 1978 and 1995 cannot support a finding of discrimination because plaintiff has failed to show a causal connection between his termination and these incidents.  "Absent a causal link between the references and the conduct complained of, such epithets become stray remarks that cannot support a discrimination verdict."  *Boyd v. State Farm Ins. Companies*, 158 F.3d 326, 330 (5th Cir. 1998) (citing *Ray v. Tandem Computers*, 63 F.3d 429, 434 (5th Cir.1995).  Plaintiff also points to the remark of a supervisor, Steve Lenoux, who used the term "Mexican rig" once at a party in plaintiff's presence.  However, assuming that the term was a racial epithet directed at the plaintiff, "[t]he mere utterance of a racial epithet is not indicia of discrimination under Title VII."  *Boyd*, 158 F.3d at 329.

Finally, plaintiff points to problems with his crew, and one crew member in particular, Hayden Abel, that continued after his promotion to captain in 1995 and that he

alleges were caused by racial bias.  However, plaintiff has failed to come forward with any evidence that these issues with his crew members, regardless of whether or not they were motivated by racial bias, are causally connected to the University's adverse employment action.  Other than the "Mexican rig" remark made by Steve Lenoux, plaintiff has not come forward with any specific evidence that his supervisors discriminated against him.  Thus, plaintiff has failed to establish a material fact issue precluding summary judgment as to his discrimination claim.

## 2.  Plaintiff's Retaliation Claim

To prove a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that "(1) he engaged in a protected activity; (2) experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action.*" Montemayor v. City of San Antonio*, 276 F.3d 687, 692 (5th Cir. 2001).  Plaintiff states in his deposition that he informally complained to his supervisors in 2000 and 2001 of problems with his subordinate crew members, that he attributed those problems to certain crew members racial bias against him, and that his supervisors did not properly address his complaints (D.E. 19, exh. B, p. 60).  At some point plaintiff also appears to have made a formal complaint about members of his crew (*see* D.E. 19, exh. C, p. 55).  Defendant concedes that after his termination, plaintiff made a complaint on June 7, 2004 to the Equal Employment Opportunity Commission alleging that the University of Texas discriminated against him by not rehiring him as a mate on board the Longhorn when that

position became available in March of 2004.  Therefore, plaintiff has shown that he engaged in a protected activity.

In addition, plaintiff experienced adverse action.  Plaintiff was terminated from his position as a senior captain and he was not rehired as a mate.  However, plaintiff did not file his complaint with the EEOC until June 7, 2004, after he was terminated from his position as senior captain and after he was denied a position as a mate  (D.E. 18, exh. D).  Therefore, plaintiff cannot show any causal connection between his EEOC charge of discrimination and the University's adverse employment decisions because the University could not possibly have known of plaintiff's EEOC charge when it made those decisions.

Nevertheless, because "the causation showing at the prima facie stage is much less stringent than a 'but for' standard," *Montemayor*, 276 F.3d at 692, the Court will assume that plaintiff has demonstrated a sufficient prima facie causal link between his complaints of racial unrest with his crew and both the University's decisions to terminate him and not rehire him.  The University of Texas has sufficiently rebutted plaintiff's prima facie case by pointing to the plaintiff's responsibility for the Longhorn's collision with the standpipe.  Furthermore, the University has sufficiently rebutted plaintiff's claim of retaliation in the decision not to hire plaintiff as a mate by presenting evidence that it has no record of ever having received plaintiff's application for that position (D.E. 18, exh. A).  At this point, "in retaliation cases where the defendant has proffered a nondiscriminatory purpose for the adverse employment action the plaintiff has the burden

of proving that 'but for' the discriminatory purpose he would not have been terminated." *Septimus v. University of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).

No reasonable juror could conclude that plaintiff would not have been terminated from his position as Senior Captain of the Longhorn, or denied a position as a mate on board the Longhorn seven months after his termination, "but for" his internal complaints in 2000 and 2001 that his crew members were racially biased against him. Plaintiff's complaints were made two years prior to his termination and three years prior to the University denying his application for a mate position. The Fifth Circuit has held that the closeness in time between a protected activity and an adverse employment action can create a genuine issue of fact on causation. *Jones v. Robinson Property Group, L.P.* 427 F.3d 987, 995 (5th Cir. 2005) (holding that a sixty-day period between the protected activity and the adverse action is sufficient to create a fact issue on causation); *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir.2001) (holding that a forty-day period is sufficient to create a fact issue). However, the two-year and three-year periods in this case are far too remote for the plaintiff to satisfy his burden and raise a fact issue on causation. Assuming that the University of Texas did in fact receive plaintiff's application for a mate position, plaintiff's general allegations in his deposition that he was unhappy with his supervisor's response to his complaints about the problems he was having with certain crew members does not in and of itself demonstrate discrimination or provide a basis for a jury to conclude the University had a retaliatory motive. Therefore, plaintiff has failed to establish a material fact issue precluding summary judgment as to his retaliation claim.

### III.  CONCLUSION

Accordingly, defendant's Motion for Summary Judgment (D.E. 18) is GRANTED, and all causes of action against defendants are DISMISSED.

ORDERED this ___2___ day of ___February___, 2006.

_____
HAYDEN HEAD
CHIEF JUDGE